BUTLER ET AL., PLAINTIFFS AND APPELLANTS, *v.* SORONDO ET AL., DEFENDANTS AND APPELLEES.

Appeal from the District Court of Arecibo in an Action to Set Aside a Will.

No. 1901.—Decided February 24, 1920.

DISCRETION OF COURT—PARTIALITY—PREJUDICE—NEW TRIAL.—Although a trial judge enjoys broad discretion in the examination of witnesses and the con-

duct and control of the trial, if owing to an erroneous view of the question at issue the case is not impartially decided on its merits because in conducting the trial the court espoused to a wholly unwarranted extent the cause of the defendants and unduly obstructed and crippled the presentation and development of the case by counsel for the plaintiffs, the case should be remanded for a new trial.

The facts are stated in the opinion.

*Messrs. E. Campillo* and *M. Tous Soto* for the appellants.

*Mr. S. Largé* for the appellees.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

Plaintiffs brought suit to set aside a will purporting to have been executed on February 3, 1915, by Dominga Butler, a woman of sixty-three years, and appeal from an adverse judgment.

The action is based upon two grounds, in substance as follows: First, that testatrix for a long time prior to the date above mentioned was in a state of complete idiocy and consequently deprived of the use of her mental faculties and, second, that the testament was concocted by the notary from data furnished by defendant Ignacio María Sorondo, husband of the testatrix, and pursuant to instructions received from him; that Dominga took no part in the making of said will, and that the witnesses to the said instrument did not hear from the testatrix the provisions and instructions that should have been given by her to the notary.

There are seven assignments of error, most of which are not without merit, going to matters of evidence and the examination of witnesses. Inasmuch as we have determined to order a new trial on other grounds, we do not deem it necessary to discuss these minor questions, which, by careful consideration of the general principles involved before the case again comes on to be heard, may be anticipated and a repetition of the same mistakes avoided.

By way of caution in this regard, however, we may suggest that there is some tendency to a difference of opinion in this court as to how far a party may impeach his own witness without showing surprise at the trial. This point

was not raised below, nor in the briefs on appeal, and need not now be determined. For, aside from any question of this sort, a majority of this tribunal are persuaded that in the case at bar enough was shown, independently of the testimony in question, to constitute a *prima facie* case for the plaintiffs sufficiently strong to render it imperative that the defendants themselves should call all the witnesses to the will, including Laureano Hernández. In the circumstances plaintiffs would perhaps lose nothing by assuming that they will have ample opportunity on cross-examination of this witness to elicit such information as they may desire from him and to impeach as much of his testimony as is inconsistent with previous statements.

And this thought suggests another, to wit, the failure of defendant Sorondo himself to take the stand. He is the principal beneficiary under the will, as well as the alleged author thereof. He was the husband of the testatrix, personally ministered to all her needs throughout her illness, and, according to the witnesses for the plaintiff, was the one person in the world to whom she could make her wants known, if at all.

The answer not only denies the facts alleged in the complaint, but sets up affirmatively the validity of the will and avers, among other details, that on the arrival of the notary, "after the usual greetings the said Dominga Butler, of sound mind and in full possession of her mental faculties, verbally gave the notary the necessary instructions to prepare and write out her open will, whereupon the notary repaired to the dining-room of the house for the purpose, which he accomplished, of quietly drawing up and engrossing the will of Dominga Butler in accordance with her instructions and conformably to her wishes."

These and other matters set up, not on information and belief but as positive facts, are sworn to by Sorondo, by Suau and by Federica and Julia Soler as within the personal knowledge of these defendants, none of whom, except

Suau, testified at the trial, and the force of his testimony is rather more than neutralized by previous statements shown to have been made in the presence of the attorney for the plaintiffs and of witness Amalia Butler.

In the circumstances, the silence at the trial of these defendants, who so unreservedly verify the averments of the answer, and especially that of the husband, the constant companion and nurse of the invalid wife and, under the terms of the will, her sole and universal heir, is most significant.

Another curious incident is the following cross-examination by the judge of witness Campillo, attorney for the plaintiffs, in regard to his interview with Suau, executor under the will, preliminary to filing suit:

"Interrogated by the judge, he testified that he did not know Bernardo Suau.

"JUDGE: Why did you invite him to go to your house?

"WITNESS: Not to my house, but to the house of Amalia Butler.

"JUDGE: But on what ground did you ask him to go to her house; how did your message run?

"WITNESS: With a member of his family.

"JUDGE: For what reason?

"WITNESS: That attorney Campillo was there and wished to talk with him; that the brothers and sisters of the deceased had retained him in the case; that at first he did not know that Bernardo Suau was not one of those whom he was representing, but was of the opposite party; that he knew he was the executor. Upon being asked whether he knew that the law made it the duty of the executor to maintain the validity of a will he replied that it might or might not. That he sent for Bernardo Suau and exacted those admissions because he was the husband of one of the heiresses, to wit, Julia Soler, a witness in this case, in order to ascertain whether her husband was willing to be made a party plaintiff.

"JUDGE: The attorney knows the law as well as I.

"WITNESS: But section 876 provides that an executor is empowered and that it is his duty to maintain the validity of a will when just.

"JUDGE: You knew that the executor could not act or do otherwise.

"WITNESS: But the statute itself makes provision therefor, be-

cause, if he did not believe the will to be just he was not obliged to appear as a party defendant. That the main object in this case was to ascertain whether witness could join his wife and sister-in-law, who lived in his house and with whom witness was not acquainted, as parties plaintiff and witness asked Bernardo Suau to present him to them, and he answered, 'You need not interview them because they will not be joined as parties,' and in anwser to questions put to him by witness he said that he did not want to be a witness and would not take one side or the other; that he did not believe the will to be a just one and that he went to him for the purpose of securing data so that he might prepare the complaint on the basis of the facts as they actually were, since it often happens that lawyers are furnished insufficient details for the purposes of the action to be brought and have to hunt up and make inquiries for the information that is lacking, and that he availed himself of his visit to Lares to interview him.

"JUDGE: It was risky. It was his duty to maintain the validity of the will.

"ATTORNEY: Always provided that he believed it to be just; but he said that he did not wish to take one side or the other.

"JUDGE: He has demonstrated the contrary here."

We are aware of no principle of law that would make it the duty of an executor named in a false and fraudulent will knowingly to maintain the validity thereof. It is conceivable that some such idea as seems to have been in the mind of the court below may have been suggested to Suau and that his general attitude toward the controversy, if not his testimony, may have been influenced thereby. Hence, the matter is mentioned in passing merely to avoid any inference from our own silence on this point that our view might coincide with that of the trial judge.

In the same spirit we may say that we are inclined to agree with the appellee that it is not indispensable in all cases that the instructions given a notary by a testator in regard to the contents of a proposed will should be delivered in the presence of the witnesses who are to be present at the actual execution thereof. The question in this case is whether or not the alleged testatrix did in fact give any

such instructions. And if she was not in the possession of her mental faculties at the time, or if, being of sound and disposing mind, she was wholly unable to express her thoughts either orally or in writing, it would seem to follow that she did not give the detailed instructions described by the notary and the executor named in the will.

In the case at bar the testimony of the notary himself indicated that the testatrix, if capable of making a will, was better able to do so in the early morning and that when the messenger came for the notary on the evening before the day on which the will was executed there was some argument as to whether or not he should go that same evening to the country in order to be at the house early the next morning. It was finally agreed that the notary should start early the next morning so as to reach his destination as soon as possible. And with this end in view he did set out at six o'clock a. m., in company with Bernardo Suau and his wife. Hence, the notary, according to his own version of this episode, had ample notice that at least the ability of the testatrix to give utterance to her thought, if not her mental capacity, might be seriously questioned at any time by interested parties with reasonable probability of success, unless the fact should be definitely established beyond all cavil at the time of making the will.

It would perhaps be the better practice in all cases, and certainly in the instance of a testator from whose physical condition it is at once self-evident that the ability to give intelligible instructions as well as the mental capacity to make a will may be challenged and thereby laid open to serious doubt, ordinary prudence and common sense should prompt an honest notary, if not to call a physician, at least to see that some expression of the purpose and desire of such testator, beyond a mere gesture or word of assent, however meager or general in terms, be made by him in the presence of the witnesses.

By the foregoing of course we do not mean to imply that

a different rule of law, as such, would apply in the circumstances indicated. For the purposes of this opinion it may be conceded that the validity of a will is never vitiated by the mere fact that the instructions were not given by the testator in the presence of the witnesses. But from this it does not follow that where the subscribing witnesses have received no intimation whatsoever as to the true purpose and intention of the testator save a nod of approval or a more or less indistinct murmur of acquiescence in the terms of a completed document read aloud by a notary, such so-called "will" may not be broken by evidence that might be regarded as ineffectual to destroy an instrument attested by witnesses before whom the testator has given some definite indication, even though in outline, as to what disposition is to be made of his property, thus evincing an appreciable degree of independent volition and of mental capacity and demonstrating his ability to express his thought in words.

As an interesting detail in this connection, mention may be made, in passing, of the following incident as illustrative of the somewhat inconsistent attitude of the court below toward this feature of the case. Although no effort had been made directly to impeach the credit of the notary as a witness, evidence of his good character was admitted on the theory that this question was in issue, and in the opinion some stress is placed on this evidence as uncontradicted testimony. On the other hand, after the notary on cross-examination had admitted having talked with the witnesses to the will subsequently to the death of testatrix and had denied having sought to obtain affidavits from them, and although neither the witness nor the attorney for the defense had suggested the possibility of self-incrimination or claimed the protection of the court, further inquiry along this line was promptly suppressed by the trial judge with the following remark:

"If counsel thinks he is conducting a criminal action he is mistaken. I cannot understand why facts which have nothing to do

with that matter are introduced. He makes charges against the witness of falsifying evidence, of bribery and of corruption. The court must protect the witness when irrelevant questions are put to him.''

The cross-examination of other witnesses for the defense was likewise unduly restricted.

Another point that it would be well for defendants to clear up, if they can, is why the testatrix, who is shown by them to have signed a notarial instrument in 1913 and does not appear to have lost the use of her right hand, was unable, if mentally capacitated, to subscribe the will two years later.

In a brief of more than one hundred pages appellants undertake to show that the trial judge was influenced by passion and prejudice to such a degree that he was unable properly to weigh the evidence adduced.

There is, of course, nothing in the record to indicate that the district judge was conscious of any impropriety of attitude or conduct. But we do feel that the court below, impelled perhaps by a high regard for the sanctity of a notarial instrument and especially of a last will and testament, took the case too much out of the hands of the parties, espoused to a wholly unwarranted extent the cause of the defendants and unduly obstructed and crippled the presentation and development of the case by counsel for plaintiffs. It follows that the merits of the case were not fairly tried and determined, and we therefore prefer to remand for a new trial rather than to dispose of the controversy as it stands by the final judgment of this tribunal.

Any adequate exposition of all the circumstances that have forced us to this conclusion, based upon the record as a whole rather than any given number of the numerous incidents that permeate the proceedings, would involve such copious extracts from the voluminous statement of the case that we omit all reference to details. It will suffice to say that during the long period that has elapsed since the case was submitted, each and every member of this court has made

a careful and independent examination of all the testimony and the matter has been the subject of much discussion and our most serious consideration.

We would not be understood as disposed to take a narrow view of the broad discretion enjoyed by a trial judge in the examination of witnesses and the conduct and control of the trial. His well-known duties and powers in this respect should be fearlessly assumed and vigorously exercised in the interest of substantial justice, but we are constrained to hold that in the instant case a due regard for that same interest demands that the judgment appealed from be reversed and the case remanded for further proceedings not inconsistent herewith.

*Reversed and remanded.*

Justices Wolf and del Toro concurred.
Chief Justice Hernández and Justice Aldrey dissented.